1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11   CUPERTINO NATIONAL BANK AND
     TRUST, a part of Greater Bay
12   Bank N.A., successor in
     interest to Cupertino National
13   Bank and Trust,
                                        NO. CIV. S-05-0835 WBS JFM
14           Plaintiff,

15      v.                              MEMORANDUM AND ORDER
                                        RE: MOTION FOR APPOINTMENT OF
16                                      RECEIVER

     ROSEVILLE FUEL PLAZA, LLC,
17   GREATER SACRAMENTO CERTIFIED
     DEVELOPMENT CORPORATION;
18   UNITED STATES SMALL BUSINESS
     ADMINISTRATION; and DOES 2
19   through 200,

20           Defendants.

21                        ----oo0oo----

22           Plaintiff brought this action to foreclose on property

23   owned by Roseville Fuel Plaza, LLC ("Roseville") which served as

24   collateral for a $2.9 million loan.  Fearing that defendant-

25   debtor Roseville Fuel Plaza, LLC. ("Roseville") is depleting and

26   will continue to deplete the collateral for the loan while the

27   foreclosure action is pending, plaintiff-lender Cupertino

28   National Bank and Trust, a part of Greater Bay Bank N.A.,

                                   1

successor in interest to Cupertino National Bank and Trust ("GBBK"), moves this court to exercise its equitable authority to appoint a receiver to secure GBBK's interest in Roseville's property. The case is before this court because GBBK also seeks to foreclose an interest in Roseville's property that was acquired by defendant United States Small Business Administration ("SBA"), and because the SBA has removed the case pursuant to 28 U.S.C. § 1444 (granting removal jurisdiction over foreclosure actions affecting property on which United States has a lien).

I.   Factual and Procedural Background

Roseville operates a commercial fueling and service station in Roseville, California. (Decl. of Katherine S. Moore in Supp. of Pl.'s Mot. for Appointment of Receiver ("Moore Decl.") ¶ 2).[1] The station consists of two buildings: a service building for truck maintenance and washing, and a commercial building with a deli and office space. (Id.).

On or about June 8, 2001, Roseville entered into a Construction Loan Agreement with GBBK and signed a Promissory Note obligating Roseville to pay GBBK (then Cupertino National Bank & Trust) $2,898,000 plus a set amount of interest over a given period of time. (See Moore Decl. ¶ 3, Ex. A (Construction Loan Agreement) and B (Promissory Note)). To secure its debt under the Construction Loan Agreement and Promissory Note, Roseville entered into a Commercial Security Agreement with GBBK, granting GBBK a security interest in all of Roseville's

---

[1]   Attached as Exhibit 1 to Pl.'s Request for Judicial Notice in Supp. of Pl.'s Mot. for Appointment of Receiver ("Pl.'s Request for Judicial Notice").

inventory, chattel paper, accounts, equipment, fixtures, and general intangibles ("collateral"). (<u>Id.</u> ¶ 4, Ex. C (Commercial Security Agreement)).

On or about April 18, 2002, Roseville and GBBK entered into a Change in Terms Agreement, amending the payment schedule set forth in the Promissory Note. (<u>Id.</u> ¶ 6, Ex. E (Change in Terms Agreement)). Collectively, the Construction Loan Agreement, the Promissory Note, the Commercial Security Agreement, and the Change in Terms Agreement are hereinafter referred to as the "Loan Agreement," except when individually referenced in parenthetical citations.

Under the Loan Agreement, GBBK extended a total loan of $2,898,000 with an interest rate of 8.25% and a maturity date of June 5, 2011. (<u>See id.</u>, Ex. E (Change in Terms Agreement)). To secure this debt further, Roseville also entered into a Construction Trust Deed and Assignment of Rents (collectively "Deed of Trust") with GBBK on or about June 8, 2001. (<u>Id.</u> ¶ 8, Exs. F (Construction Trust Deed) and G (Assignment of Rents)). The Deed of Trust conveyed Roseville's real property at 9077 Foothills Boulevard and 1371 Alberston's Drive ("the Property") to Greater Bay Bancorp as trustee for Cupertino National Bank and Trust (then a separate bank entity), and is a first priority lien. (<u>Id.</u> ¶ 9).

The Loan Agreement contains several provisions making it a default for Roseville to:

- lease its property without GBBK's prior written

consent;[2]

- make a sale of any of its collateral other than in the ordinary course of business or fail to immediately deliver the proceeds of any sale to GBBK;[3]

- fail to pay property tax obligations;[4] and

---

[2]     NEGATIVE COVENANTS . . . "[Roseville] shall not, without the prior written consent of [GBBK], . . . sell transfer, mortgage, assign, pledge, lease, grant, a security interest in, or encumber any of [Roseville's] assets."

(Moore Decl., Ex. A (Construction Loan Agreement) at 6)(emphasis added).

[3]     Transactions Involving Collateral

Except for inventory sold or accounts collected in the ordinary course of [Roseville's] business, [Roseville] shall not sell . . . the Collateral. . . . A sale in the ordinary course of [Roseville's] business does not include . . . any bulk sale. . . . Unless waived by [GBBK], all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for [GBBK] and shall not be commingled with any other funds; provided, however, this requirement shall not constitute consent by [GBBK] to any sale or other disposition. Upon receipt, [Roseville] shall immediately deliver any such proceeds to [GBBK].

(Moore Decl., Ex. C (Commercial Security Agreement) at 2) (emphasis added).

Violation of this provision constitutes a default because the Loan Agreement defines a default as "[f]ailure to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement. . . .")(See id. at 3).

[4]     AFFIRMATIVE COVENANTS. [Roseville] covenants and agrees with [GBBK] that, while this Agreement is in effect, [Roseville] will: . . . [with regards to] Taxes and Claims [,][pay] and discharge when due all of [Roseville's] indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Property or improvements; provided, however, that [Roseville] shall not be required to pay and discharge

4

●       fail to maintain a debt coverage ratio defined as

follows: "Net Operating Income divided by

Principal and Interest Expense of 1.50 to 1.00."

(Moore Decl., Ex. A (Construction Loan Agreement) at 5).

The Deed of Trust provides that GBBK can declare the entire loan amount immediately due if Roseville conveys a leasehold interest in the Property with a term greater than three years. (Id., Ex. F (Construction Trust Deed) at 3 (Due on Sale - Consent by Lender)).

The various documents constituting the Loan Agreement and Deed of Trust provide that "[f]ailure of [Roseville] to comply with any term, obligation, covenant, or condition in . . . any of the [r]elated [d]ocuments" constitutes an event of default under each document. (See, e.g., Moore Decl., Ex. G (Assigment of Rents) at 2-3). Upon Roseville's default, multiple provisions in the Loan Agreement and the Deed of Trust also purport to give GBBK the right to have a receiver appointed as a matter of right and to take possession of the collateral and the Property. (See id., Ex. A (Construction Loan Agreement) at 8 (granting right to appointment of receiver upon default); Ex. C (Commercial Security Agreement) at 4 ("Rights and Remedies on Default - Appoint

---

any such indebtedness, obligation, or claim so long as (a) its legality shall be contested in good faith by appropriate proceedings, (b) the indebtedness, obligation, or claim does not become a lien . . . and (c) [Roseville] shall have established on its books adequate reserves with respect to the amount contested in accordance with generally accepted accounting practices. . . .

(Moore Decl., Ex. A (Construction Loan Agreement) at 5-6) (emphasis added).

Recevier"); Ex. F (Construction Trust Deed) at 6 (same); Ex. G
(Assignment of Rents) at 3 (same)).

In February 2003, Roseville failed to make its monthly
loan payment to GBBK. (Burns Reply Decl. ¶ 3). In March 2003,
Kevin Schulze and Gary Schulze, Roseville's owners, contacted
Roxanne Burns, then a lending manager at GBBK, to discuss a
possible deferment of Roseville's loan payments because Roseville
was having difficulty meeting its financial burdens. (Id.). At
the time, the Schulzes represented that they were either going to
sell Roseville for $5.2 million or sell its delicatessan/café
operation to a third-party and lease the space to that operator.
(Id.). Based on that representation, GBBK agreed to defer
Roseville's loan payment until August 2003. (Id.). When the
deferment period ended, Roseville again defaulted on their
payments. (Id. ¶ 4).

In December 2003, Kevin Schulze set up a meeting with
Roxanne Burns, then a lending manager at GBBK, to discuss the
status of Roseville's business and "also some ideas [Schulze had]
to get [Roseville] the relief [it] needed." (Req. For Judicial
Notice in Opp'n to Pl.'s Mot. for Appointment of Receiver, Ex. B
(Decl. Of Kevin Schulze ("Mr. Schulze") in Opp'n to Pl.'s Mot.
for Appointment of Receiver (filed in state court before
removal)) ("Schulze Decl.") ¶¶ 7, 9; Burns Reply Decl. ¶¶ 1,5).
Mr. Schulze attended the meeting with his father, Gary Schulze,
and their financial advisor, Ed Ryan. (Schulze Decl. ¶ 7). Mr.
Schulze and his entourage discussed with Ms. Burns their hope
that the bank would allow them to refinance the Deed of Trust.
The Roseville representatives informed Ms. Burns that they

intended to split the Property into two separate lots and sell
the portion with the office building and delicatessan.  They also
informed her that they were forming a new mobile oil lube
servicing business and requested that GBBK restructure the loan.
(Burns Reply Decl. ¶ 5).  Ms. Burns told the Roseville
representatives that their proposal had merit, but that they
would have to submit a formal request and provide a financial
package to GBBK for GBBK to consider restructuring the loan.
(Schulze Decl. ¶ 7).  Kevin Schulze acknowledges that the parties
"certainly did not reach any agreement at the meeting."  (Id.).
However, he states that he immediately sent the requested
information to GBBK after the meeting but that by mid-2004, the
bank still had not responded.  (Id. ¶¶ 7-8).  Ms. Burns states
that Roseville never provided the requested information to GBBK
and again failed to make its monthly payments.  (Burns Reply
Decl. ¶ 6).

        Ms. Burns later learned that Roseville's owners had
formed a new entity called Refinery Mobile Division ("Refinery
Mobile") which had entered into a five-year lease with Roseville
for part of Roseville's office building and other areas,
effective January 1, 2004 (Id. ¶ 7).

        GBBK treated Roseville's failure to make loan payments
after December 2003 as a default under the Loan Agreement and
sent a notice of default and demand for payment to Roseville on
March 25, 2004.  (Id. ¶ 8).  Thereafter, Gary Schulze requested
to meet with GBBK to discuss Roseville's loan.  The meeting was
originally scheduled for May 2004, but GBBK had to cancel the
meeting because Roseville failed to submit the information

7

requested by GBBK.  (Id. ¶ 9).

On May 12, 2004, Gary Schulze sent a letter to Katherine Moore, GBBK's senior special assets officer, requesting that GBBK reconsider the commencement of foreclosure proceedings and submitting a written proposal to restructure the terms of its loan.  (Moore Reply Decl. ¶ 3).  Another meeting was scheduled for June 3, 2004.  (Burns Reply Decl. ¶ 11).[5]  In preparation for that meeting, Ms. Moore sent a letter to the Schulzes on May 21, 2004, advising Roseville that GBBK was not in a position to approve the request outlined in Roseville's letter without further information regarding Roseville's ability to service the debt after the proposed restructure of the loan and whether Roseville had a source of funds for covering shortages.  (Moore Reply Decl. ¶ 4).  She further advised the Schulzes that they would need to submit a proposal containing the requested information at least 48 hours before the June 3, 2004 meeting. (Id., Ex. A (May 21, 2004 Letter)).

After Roseville submitted an inadequate cash flow analysis, Ms. Moore sent another letter to the Schulzes on June 2, 2004, advising them of GBBK's concerns with their request and informing them that the personnel attending the June 3, 2004 meeting had no authority to bind GBBK, and that any proposal would have to be approved by the appropriate credit authorities within GBBK.  She further informed them that GBBK would not be

_____

[5]     Kevin Schulze refers to this meeting as a May 2004 meeting in his declaration.  (Schulze Decl. ¶ 9).  However, declarations from others at the meeting confirm that it actually took place in June.  (See, e.g., Moore Decl. ¶ 6).  The specific date of the meeting is immaterial to the resolution of this motion.

bound by any agreement, unless GBBK's credit committee approved the terms and GBBK executed written documentation of an agreement. (Id. ¶ 5, Ex. B (June 2, 2004 Letter to Schulzes)).

At the June 3, 2004 meeting were the Schulzes, a member of Roseville named Robert Nurisso, Ms. Burns, Ms. Moore, and GBBK service manager Anthony Pare, and Ms. Moore. (Id. ¶ 9).[6] During the course of the meeting, those present discussed Roseville's business struggles and the strategies Roseville was employing to overcome them. The parties' representatives discussed in detail a proposal to lease Roseville's fuel operation to an outfit called Toms Sierra Company, dba Sierra Energy ("Toms Sierra"). Kevin Schulze declares that Ms. Burns told him that she thought his idea of leasing the fuel operation to Toms Sierra was a "very good one." (Id. ¶ 10). According to Kevin Schulze, "[no] bank representative expressed even a hint of disapproval about the idea." (Id.). Ms. Burns acknowledges that she said the idea "appeared to have merit," but that GBBK would need to see the financial statements and documents before it could decide whether to approve the lease. (Burns Reply Decl. ¶ 12). After Gary Schulze stated that he was not going to "put another penny into the business," the meeting ended. (Id.).

The next day, on June 4, 2004, GBBK received an e-mail from Kevin Schulze stating that Roseville would make its loan payments and provide GBBK with financial statements and documentation. (Moore Reply Decl. ¶ 7). Kevin Schulze also made

---

[6] Ms. Burns also recalls that Ed Ryan, the Schulze's financial adviser, and Larry Cretan of GBBK were there. (Burns Reply Decl. ¶ 12).

another proposal to bring Roseville's loan current. (Id.).
Thereafter, Roseville provided some financial documentation to
GBBK, but did not provide enough information for GBBK to consider
the proposal. (Id.).

On June 29, 2004, Roseville's people sent another email
to GBBK regarding the release of a lien on its fuel inventory,
which was referenced in the proposed lease between Roseville and
Toms Sierra and confirmed they would provide a copy of the
proposed lease. (Id. ¶ 9). On July 23, 2004, Ms. Moore received
a copy of the lease that contained finalized terms. (Id. ¶ 10,
Ex. D (Card Lock Facility Lease Agreement)). It was apparent
from the lease that it had taken effect on July 1, 2004. (Id.).

Pursuant to the lease, Roseville transferred its
fueling business to Toms Sierra for $250,000, with a $25,000
deposit made at the commencement of the lease and the remaining
$225,000 financed through a five-year promissory note. Roseville
leased the property used to operate the commercial gas station to
Toms Sierra for five years, and sold all of its fuel inventory to
Toms Sierra. (Id.). GBBK never gave its consent for this lease.
(Id. ¶ 11).

On June 30, 2004, Ms. Moore sent the Schulzes a letter
instructing Roseville to deposit the proceeds from the lease of
Roseville's fueling business and the sale of its fuel inventory
into a collateral account until GBBK either consented to the
lease or the lease was rescinded. Roseville deposited
approximately $4,350 into the account but subsequently refused to
deposit the balance of the sale proceeds. (Id. ¶ 12; Moore
Decl., Ex. H (June 30, 2004 Letter)).

On August 19, 2004, Roseville sent GBBK a letter with
an attached cash flow projection. (Moore Reply Decl. ¶ 13; Moore
Decl., Ex. I (August 19, 2004 Letter)).  This projection took
into account the cash Roseville expected to receive based on a
proposed restructuring of a loan and a sale of the
delicatessen/office building that never occurred.  (Moore Reply
Decl. ¶ 13).

On October 11, 2004, Roseville's then counsel, John J.
Meissner, Jr., responded to Ms. Moore's letter with his own
letter on October 11, 2004.  In that letter, Mr. Meissner
acknowledged Roseville's transfers to, among others, Refinery
Mobile and Toms Sierra, but argued that his client "received
verbal encouragement from the bank to take [the subject]
actions."  (Moore Decl., Ex. J (October 11, 2004 Letter)).
However, Ms. Moore declares that she had many discussions
regarding how Roseville could cure the transfers GBBK considers
to be defaults, but that Roseville has failed to meet the
conditions offered by GBBK.  (Id. ¶ 14).

Roseville's owners have repeatedly told Ms. Moore that
Roseville has struggled financially from the inception of its
operations and that it has a negative monthly cash flow for which
its owners contribute funds to make up the shortfall.  (Moore
Decl. ¶ 18, see also id., Ex. I (August 19, 2004 Letter) ¶ 11).

Ms. Moore also believes that, based on her review of
Placer County's online property tax bill search feature,
Roseville owes approximately $105,000 in property taxes on the
subject Property.  (Id. ¶ 16).  Kevin Schulze states that all of
Roseville's property taxes were paid after he lawfully contested

a reassessment.  (See July 11, 2005 Declaration of Kevin Schulze in Opp'n to Pl.'s Motion for Appointment of Receiver ("Schulze July Decl.") ¶ 3).  The Loan Agreement allows Roseville to withold taxes while lawfully contesting a reassessment so long as Roseville maintains adequate reserves with respect to the amount contested as allowed by the Loan Agreement.  (See Moore Decl., Ex. A (Construction Loan Agreement) at 5-6 (allowing Roseville to contest taxes)).

As of June 16, 2005, the amount outstanding on the loan that is the crux of this case is approximately $3,180,963. (Moore Reply Decl. ¶ 14).

GBBK filed this action to, among other things, judicially foreclose on the Property and appoint a receiver to take possession of the Property and collect the rents therefrom, and to collect any other payments, income, and revenue from the collateral.

In the instant motion, GBBK requests only that the court appoint a receiver over the subject Property, and nominates J. Benjamin McGrew to act as that receiver.  Defendant SBA filed a late opposition that does not address the substance of plaintiff's motion.[7]  Defendant Roseville does not dispute that

_____

[7]  Defendant SBA contends that this motion is moot because "even if this Court were to grant [GBBK's] motion and appoint a receiver, before the receiver could accept his appointment, there will be no property left for the receiver to administer."  (See Response of the United States to Mot. to Appoint a Receiver at 1-2).  SBA represents that it has received notice that GBBK has scheduled a nonjudicial sale of the real estate at issue for July 12, 2005, at 10:00 a.m., the morning after the hearing on this motion.  (Id. at 1).  However, both plaintiff's and defendants' counsel represented at oral argument that the nonjudicial sale may not go through.  Therefore, the appointment of a receiver is

12

Mr. McGrew could appropriately serve as a receiver, but argues that it would be inequitable to appoint any receiver in this matter because there has been no <u>monetary</u> default, and because any default was <u>orally</u> approved by GBBK representatives. Roseville also requests a 30-day continuance of the motion to allow Roseville to complete "take-out financing" to pay off GBBK's loan.

II. <u>Discussion</u>

Federal Rule of Civil Procedure 66 ("Rule 66") and federal case law govern the appointment of a receiver in federal court, and not state law. <u>New York Life Ins. Co. v. Watt West Investment Corp.</u>, 755 F. Supp. 287, 288-94 (E.D. Cal. 1991). Rule 66 provides that:

> The practice in the administration of estates by receivers . . . appointed by the court shall be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the district courts.

Fed. R. Civ. P. 66.

Ninth Circuit case law establishes that "[r]eceivership is an equitable remedy and [that] a receiver will be appointed when the most speedy and perfect administration of justice and the rights of the parties interested in the property will be best secured by such action." <u>View Crest Garden Apartments, Inc. v. United States</u>, 281 F.2d 844, 849 (9th Cir. 1960)(citation and internal quotation marks omitted). In this district, the Local Rules do not speak to the factors courts should consider in determining whether to appoint a receiver. <u>See</u> Local Rule 66-

not yet moot.

232(addressing only procedures for bringing motions for appointment of receiver but not what factors courts are to consider in deciding such motions).  However, in <u>New York Life</u>, this court noted several factors courts use to determine whether to appoint a receiver:

> (1) fraudulent conduct on defendant's part;
> (2) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;
> (3) inadequacy of legal remedies;
> (4) probability that harm to plaintiff by denial of appointment would outweigh injury to parties opposing appointment;
> (5) plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and
> (6) whether plaintiff's interests sought to be protected will in fact be well-served by receivership.

755 F. Supp. at 292.  In weighing these factors, the court must give special consideration to the adequacy of the security and the financial position of the debtor.   <u>Id.</u>

Under California law, a contractual consent to the appointment of a receiver upon default gives a party a near absolute right to the appointment of a receiver upon default. <u>Resolution Trust Corp. v. Bayside Developers</u>, 43 F.3d 1230, 1242 (9th Cir. 1994)(addressing power of court to appoint receiver pursuant to Cal. Civ. Proc. Code § 564 and California case law). Under federal law, however, such contractual provisions are not dispositive, though they are given great weight in considering the balance of hardships between the subject parties.  <u>See</u> <u>New York Life</u>, 755 F. Supp. at 293(finding "little hardship in enforcing the terms of the parties' bargain.").

A.   <u>Roseville Has Defaulted on the Loan Agreement</u>

GBBK contends that Roseville has defaulted on the Loan

14

Agreement by (1) leasing property to Refinery Mobile and Toms
Sierra without GBBK's written consent; (2) selling all of its
fuel inventory to Toms Sierra and failing to pay GBBK the
proceeds from the fuel sale to Toms Sierra; (3) failing to
maintain the debt coverage ratio required under the Loan
Agreement; and (4) failing to pay property taxes.

>    1.    Leasing Property to Refinery Mobile and Toms
>          Sierra

The Loan Agreement clearly prohibits Roseville from
leasing any of its assets.  (Moore Decl., Ex. A (Construction
Loan Agreement) at 6("Negative Covenants - Indebtedness and
Liens")).  Roseville does not dispute that it leased the property
to both Refinery Mobile and Toms Sierra.  (See id., Ex. J
(October 11, 2004 Letter from Roseville's counsel)).  Therefore,
the leases constitute defaults.

>    2.    Selling Fuel Inventory to Toms Sierra

The Loan Agreement provides that Roseville shall not
make any sale of any of its collateral outside the ordinary
course of its business, and that, should such a sale occur,
Roseville must immediately deliver the proceeds from the sale to
GBBK.  (Id., Ex. C (Commercial Security Agreement) at 2).
Roseville does not dispute that it sold its fuel inventory to
Toms Sierra.  (See Moore Reply Decl. ¶ 10, Ex. D (Card Lock
Facility Lease Agreement); see also Moore Decl., Ex. J (October
11, 2004 Letter from Roseville's counsel)(admitting this)).  Nor
has it argued that such sale was in the ordinary course of
business.  The sale thus constitutes a default.

Roseville's failure to turn over immediately to GBBK

15

the proceeds from the fuel sale to Toms Sierra is also wrongful. In fact, in his August 19, 2004 letter to Ms. Moore, Kevin Schulze admits that Roseville does not intend to ever deliver the proceeds from the sale to GBBK. The letter states in pertinent part:

> [I]t was Roseville Fuel Plaza's intent to submit the payment [for the sale] to [GBBK] for deposit into a collateral account. However, upon further review, it is our feeling that if additional collateral and an additional guarantor are being provided, this should more than compensate [sic] the collateral that the lender feels is being lost.

(Moore Decl., Ex. I (August 19, 2004 Letter) at 1). Roseville's effort to unilaterally waive the Loan Agreement provision requiring them to turn over the sale proceeds to GBBK is unavailing. This, too, is a default.

### 3. Failure to Maintain Required Debt Coverage Ratio

The Loan Agreement provides that Roseville must maintain a debt coverage ratio of 1.50 to 1.00. This is defined as "Net Operating Income divided by Principal and Interest Expense." (Id., Ex. A (Construction Loan Agreement) at 5). GBBK does not expound on why it believes there has been a default under this clause, and Roseville does not specifically address the issue. However, Roseville does admit that "[its] business has struggled financially from day one. Two years and four months have gone by and we are still operating at a net monthly loss." (Id., Ex. I (August 19, 2004 Letter) at 11)(emphasis added). If Roseville has been operating at a net monthly loss, then its net operating income divided by principal expense could not have been positive, much less 1.50 to 1.00. Therefore, Roseville has defaulted on this part of the Loan Agreement.

16

### 4. Failure to Pay Property Taxes

The Loan Agreement provides that Roseville must pay all of its taxes and other obligations when due, except that it "shall not be required to pay and discharge any such indebtedness, obligation or claim so long as . . .its legality shall be contested in good faith by appropriate proceedings." (Id., Ex. A (Construction Loan Agreement) at 6). GBBK contends that Roseville has been delinquent in paying its property taxes. (Id. ¶ 16). However, Roseville has produced sufficient evidence to establish that all of Roseville's property taxes were paid after it lawfully contested a reassessment. (Schulze July Decl. ¶ 3). Therefore, the court does not find that Roseville has defaulted on this portion of the Loan Agreement.

### 5. Roseville's Faults Are Not Excusable

Roseville ignores the default based on its failure to maintain the proper debt coverage ratio, but denies the other defaults because they are nonmonetary and because the subject transfers and sale were orally approved by GBBK's representatives. (Def.'s Mem. in Opp'n to Pl.'s Mot. for Appointment of Receiver ("Def.'s Opp'n") at 2). Neither argument is persuasive.

A default does not have to be monetary in order to be a default; in fact, a nonmonetary default can be a material breach of a contract. See, e.g., In re Qintex Entm't, Inc., 950 F.2d 1492 (9th Cir. 1991)(finding nonmonetary default to be material breach although agreement did not specifically cover nonmonetary default). Further, the Loan Agreement does not require a monetary default before GBBK gains the right to have a receiver

17

appointed.  The Loan Agreement requires "the occurrence of <u>any</u> <u>Event of Default</u>." (<u>See</u>, <u>e.g.</u>, Moore Decl., Ex. G (Assignment of Rents) at 3).  Requiring a monetary default would render GBBK powerless to enforce several provisions of the Loan Agreement set out in plain, unambiguous terms that were deliberately included in that Agreement to enable Roseville to secure an almost $3 million loan.

Nor did GBBK's representatives orally approve the transfers and sale constituting defaults under the Loan Agreement.  Ms. Burns never approved Roseville's lease to Refinery Mobile.  Though Ms. Burns acknowledges that she informed the Schulzes that the proposed transfer had merit, she states that Roseville never provided the information GBBK needed to process a formal request. (Burns Reply Decl. ¶ 6).  Even if Roseville did provide the information, GBBK never obtained written consent for the transfer as required by the Loan Agreement.  (<u>Id.</u> ¶ 7; <u>see also</u> Moore Decl. Ex. A (Construction Laon Agreement)(forbidding transfers of collateral without prior written consent) at 6).

Roseville did not obtain prior written consent for the transfer and sale to Toms Sierra, either.  Roseville contends that its representatives were entitled to go forward with the transfer and sale because Ms. Burns told them at the June 3, 2004 meeting that the idea to lease Roseville's fuel operation to Toms Sierra was "a very good one," and because "[n]o bank representative experessed even a hint of disapproval about the idea." (Schulze Decl. ¶ 10).  However, this characterization of the events is misleading.

Before the June 3, 2004 meeting, Ms. Moore informed the Schulzes that the personnel attending the meeting did not have authority to bind GBBK and that any proposal would have to be approved by the appropriate credit authorities within GBBK. She also informed them that GBBK would not be bound by any agreement, unless GBBK's credit committee approved the terms and GBBK executed written documentation. (Moore Reply Decl. ¶ 5, Ex. B (June 2, 2004 Letter to Schulzes)). At the meeting, Ms. Burns reiterated that GBBK would need to see some financial statements and documents before it could decide whether to approve the lease. (Burns Reply Decl. ¶ 12). Afterwards, Gary Schulze ended the meeting by declaring that he was not going to "put another penny into the [Roseville's] business." (Id.).

Only by taking a few isolated statements out of context could one infer that Ms. Moore gave Roseville oral approval to go ahead with a lease to Toms Sierra. Nor is there any record that the parties even discussed any sale of fuel inventory to Toms Sierra. Therefore, contrary to Roseville's contentions, Ms. Moore never orally waived the Loan Agreement provision specifically requiring Roseville to obtain GBBK's written consent before transferring any collateral. (Moore Decl., Ex. A (Loan Construction Agreement) at 6)(forbidding transfers of collateral without GBBK's prior written consent).

B. <u>Appointment of a Recevier is Appropriate</u>

Roseville cites numerous cases to argue that the appointment of a receiver is "drastic," and "a remedy of last resort." (Def.'s Opp'n at 2-3)(citing <u>Ferguson v. Tabah</u>, 288 F.2d 665, 674 (2d Cir. 1961); <u>Minzter v. Arthur L. Wright & Co.</u>,

263 F.2d 823, 824 (3d Cir. 1959); <u>Connolly v. Gishwiller</u>, 162
F.2d 428, 435 (7th Cir. 1947); <u>Bracco v. Lackner</u>, 462 F. Supp.
436, 456 (N.D. Cal. 1978)).  None of these cases involve
situations where the contract explicitly gives the right to have
a receiver appointed in the event of a default.  Cases where the
contract specifically provides for the appointment of a receiver
are marked by considerably different language.  <u>See</u> <u>New York</u>
<u>Life</u>, 755 F. Supp. at 293(noting that deed of trust specifically
provided for appointment of receiver and stating "[t]here is
little hardship in enforcing the terms of the parties' bargain.";
<u>Okura & Co. v. Careau Group</u>, 783 F. Supp. 482, 499 (C.D. Cal.
1991)(appointing receiver as provided for in deed of trust
without any discussion beyond "appointment of receiver [sic] . .
. is necessary to protect the plaintiff's interest in the
interim.").

        Properly understood, the case law thus holds that
appointment of a receiver is not a drastic remedy in a situation
like this one, where the borrower has defaulted on the Loan
Agreement in several ways and the agreement explicitly provides
for the appointment of a receiver in the event of default.
However, this is not the only factor that weighs in favor of the
appointment of a receiver.

        The two factors most important to the analysis, the
adequacy of the security and the financial position of the
debtor, also weigh in favor of appointing a receiver.  <u>See</u> <u>New</u>
<u>York Life</u>, 755 F. Supp. at 292(finding these factors to be most
important).  Roseville contends that the security is adequate
because various appraisals establish that the Property is worth

substantially more than Roseville's debt, such that the Property
has a $500,000 equity cushion.  However, Roseville has shown a
propensity to transfer its interests and collateral without
obtaining GBBK's consent.  Roseville's alleged "equity cushion"
does not prevent Roseville from transferring any more collateral.
Nor has Roseville disputed that its financial strength is
doubtful or that it is in danger of becoming insolvent.  In its
papers, Roseville evasively answers GBBK's charge that its owners
have to infuse nonobligatory amounts of cash into the business
each month to keep it going, glibly stating that the charge "may
or may not be true."  (Def.'s Mem. of P. & A. in Opp'n to Pl.'s
Mot. for Appointment of Receiver at 4).  Roseville's own cash
flow projection through July 2005 showed a negative monthly cash
flow.  (Moore Reply Decl. ¶ 13).  Roseville has also admitted
that its business "has struggled from day one."  (Moore Decl.,
Ex. I (August 19, 2004 Letter) at 11).  Under the circumstances,
Roseville appears to be in a precarious financial position.

        Virtually all the factors generally considered when
deciding whether to appoint a receiver suggest that one should be
appointed in this case: (1) GBBK has not shown outright fraud on
Roseville's part; but (2) there appears to be an imminent danger
that the Property may be lost through additional wrongful
transfers; (3) legal remedies would be inadequate to compensate
GBBK should Roseville become insolvent; (4) the balance of
hardships tips in GBBK's favor because the parties contracted for
this remedy, see New York Life, 755 F. Supp. at 293; (5) GBBK is
almost certain to prevail on the merits of its foreclosure action
because Roseville has defaulted; and (6) the appointment of a

receiver will serve to protect the collateral from wrongful dissipation while hopefully improving Roseville's business under new management.

Just as in <u>New York Life</u>, "[t]his is a straightforward foreclosure action on secured property." <u>Id.</u>, 755 F. Supp. at 293. The appointment of a receiver is necessary to prevent further dissipation of secured collateral, and entirely appropriate for this situation. GBBK's suggested receiver, J. Benjamin McGrew, is highly qualified to serve as receiver, and Roseville has not come forward with any reason not to appoint him to this position. Therefore, the court will appoint Mr. McGrew as receiver. However, because counsel for all parties agreed at oral argument that a 20-day stay of such order would be appropriate to allow Roseville to attempt to refinance the loan, the court will grant the stay.

IT IS THEREFORE ORDERED that plaintiff's motion to appoint J. Benjamin McGrew as a receiver over the subject property be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the above order appointing a receiver be, and the same hereby is, STAYED FOR 20 DAYS from the date of this order AND that during such stay, the receiver shall do no work and incur no fees or expenses in his capacity as receiver.

DATED: July 12, 2005

_William B. Shubb_
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

22